David K. Sealy, Kerry Carter and
Harvey L. Davis, on behalf of the
Old Dominion 401(k) Retirement
Plan, and all others similarly situated,

      Plaintiffs,

      v.

Old Dominion Freight Line, Inc.,

      Defendant.

_____

## CLASS ACTION COMPLAINT

1.    This action seeks to protect the retirement savings of more than 26,000 Old Dominion Freight Line, Inc. ("Old Dominion") employees who are participants in the Old Dominion Freight Line, Inc. Retirement Plan ("Plan").

2.    Old Dominion has a fiduciary duty to ensure that its Plan does not charge excessive fees to Plan participants. But over the past six years, Plan participants have paid more than $10 million in excessive and unreasonable compensation to Empower Plan Services, LLC ("Empower"), the Plan's recordkeeper. Plan participants will continue to pay grossly excessive compensation to Empower unless this action moves forward.

3.    In addition, Old Dominion has a fiduciary duty to prudently select investments offered through the Plan. The Plan is eligible – given its massive size and economies of scale – for discounted pricing on investments. Instead of taking advantage of favorable pricing, Old Dominion caused Plan participants to pay more for investments than what they were eligible for and more than what they should have paid. Over the past six years, Plan participants have paid an estimated

$22 million in unnecessary, unreasonable, and excessive investment related fees. These fees are tantamount to waste. And, again, Plan participants will continue to have their retirement savings wasted due to excessive investment related fees unless this action moves forward and corrected actions are taken by Old Dominion.

4.      David K. Sealy, Kerry Carter, and Harvey L. Davis ("Plaintiffs") bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from Old Dominion's breaches of fiduciary duty.

## JURISDICTION AND VENUE

5.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.      This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## ERISA

7.      The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, Old Dominion is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing

a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

8.      "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries….Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This principal favors liberal construction of pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

9.      While everyone who participates in a 401(k) plan pays fees to maintain their account, industry insiders report that over 70% of people do not believe they pay any fees. In an effort to help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often fees are hidden from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

10.     Such is the case here. The account statements that Old Dominion provides to its Plan participants do not disclose the total fees and compensation paid to Empower by Plan participants. In addition, the Plan's Annual Form 5500 Department of Labor reports are supposed to identify the compensation paid to third parties, but as discussed below, they do not.

11.     Old Dominion's fiduciary obligations with respect to the Plan are especially important because Plan participants cannot negotiate fees charged to Plan participants. Plan participants must trust that Old Dominion will prudently do so. Old Dominion is also responsible for selecting investments and hiring service providers for the Plan. These fiduciary decisions have

Case 1:23-cv-00819   Document 1   Filed 09/27/23   Page 3 of 38

the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-2 (Aug. 2013).

12.     That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings. The Plan currently has nearly $1.8 billion of assets under management. A 28% loss of $1.8 billion equals more than $50 million. These numbers underscore the importance of Old Dominion's ERISA fiduciary duties. Imprudence results in massive financial losses to workers forced to rely on Old Dominion to prudently administer the Plan.

13.     Accordingly, Old Dominion must engage in a rigorous process to control fees and ensure that Plan participants pay no more than a reasonable level of compensation to the Plan's service providers. This is particularly true for billion-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

14.     The entities that provide administrative services and investments to retirement plans have a strong incentive to maximize their fees. Each dollar in fees paid from participants' retirement savings reduce by the same amount participants' retirement savings, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to

control, negotiate, monitor, and reduce a plan's fees.

15. Plan fiduciaries must be cognizant that self-interested third parties seek to maximize fees from plans, and fiduciaries may not simply accede to demands, or agree to quotes without negotiating or considering alternatives. In order to act in the exclusive interest of a Plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. However, as is often the case, and as is true here, fiduciaries like Old dominion fail to do so resulting in millions of losses to Plan participants.

## THE PLAN

16. The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

17. The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18. Eligible current and former employees of Old Dominion are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former Old Dominion's employees.

19. Defined contribution retirement plans are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

20. As of December 31, 2022, the Plan had $1,791,772 in assets and 26,874 participants with account balances. The Plan qualifies as a "mega" plan in the 401(k) marketplace.

21. Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, Old Dominion caused the Plan to pay unreasonable and excessive compensation to Empower. Old Dominion also wasted Plan participants' retirement savings by causing them to pay more for investments when identical investments were available to the Plan at much lower costs

to Plan participants.

## THE PARTIES

### *The Plaintiffs & Standing*

22.    To the extent the Plaintiffs must show individual injuries, even though §1132(a)(2) does not provide redress for individual injuries, Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan, suffered losses because of Old Dominion's imprudence, and were injured by Old Dominion's unlawful conduct. All participants continue to be harmed by the ongoing inclusion of Old Dominion's fiduciary breaches.

23.    Plaintiffs are participants in the Plan under 29 U.S.C. §1002(7).

24.    Named Plaintiff David K. Sealy is a resident of Florida. He worked for Old Dominion from September of 2014 through March of 2022.  He is a current participant in the Plan. Through his individual account in the Plan, Plaintiff Sealy invested in the JP Morgan SmartRetirement 2040 R5 fund. He remains invested in the fund today.

25.    Plaintiff Sealy's individual retirement account was injured by Old Dominion's breach of fiduciary duty of prudence.  It continues to suffer the same injuries even today.

26.    To begin with, Plaintiff Sealy suffered financial harm in the form of lost money/retirement savings because of Old Dominion's inclusion of the imprudent R5 share class JP Morgan SmartRetirement target dates funds.   Thus, Plaintiff Sealy invested in a fund specifically challenged by this Complaint.  Should Plaintiffs prevail, the value of Plaintiff Sealy's individual retirement account would increase as a result of any Plan recovery because he is invested in a challenged fund.

27.    Old Dominion committed a Plan-wide breach causing financial harm to Mr. Sealy's individual account because of the Plan's inclusion of R5 share class JP Morgan SmartRetirement

- 6 -

target dates funds. More specifically, Old Dominion's inclusion of the JP Morgan SmartRetirement 2040 R5 fund caused Plaintiff Nealy to pay excessive fees in the form of needless and additional basis points which, in turn, resulted in the loss of money from his retirement account, when a different version of the exact same investment was available to the Plan with identical managers, investments styles, and funds, that had lesser fees, as demonstrated by the table below.

28.    Named Plaintiff Kerry Carter is a resident of Mississippi. He has been employed by Old Dominion since 2017. He is a current participant in the Plan. Through his individual account in the Plan, Plaintiff Carter was invested in the EuroPacific Gr R5 fund.

29.    Plaintiff Carter's individual retirement account was injured by Old Dominion's breach of fiduciary duty of prudence. It continues to suffer the same injuries even today.

30.    Plaintiff Carter suffered financial harm in the form of lost money/retirement savings because of Old Dominion's inclusion of the imprudent R5 share class for the EuroPacific fund. Thus, Plaintiff Carter invested in a fund specifically challenged by this Complaint. Should Plaintiffs prevail, the value of Plaintiff Carter's individual retirement account would increase as a result of any Plan recovery because he is invested in a challenged fund.

31.    Old Dominion imprudently caused the Plan's recordkeeper, Empower, to receive millions of dollars of excessive recordkeeping compensation from the Plan and its participants, including Plaintiffs Sealy and Carter, by causing the Plan to pay Empower excessive direct fee compensation, excessive float compensation, and excessive revenue sharing compensation.

32.    By way of specific example and not limitation, as set out below, like all Plan participants, Plaintiffs Sealy and Carrter suffered financial harm in the form of lost money/retirement savings because Old Dominion caused them to pay $67 per year in 2022 just in

direct compensation to Empower when other prudent fiduciaries, including those for plans of similar size and holdings, some also utilizing Empower as recordkeeper, secured the same services for less than half the cost.

33.     As set out below, Plaintiffs Sealy and Carter paid similarly excessive amounts in direct compensation for recordkeeping every year they invested in the Plan, including $71 in 2021, $79 in 2020, when, once again, other prudent fiduciaries, including those for plans of similar size and holdings,  some also utilizing Empower as recordkeeper, secured the same services for less than half the cost.

34.     Plaintiffs Sealy and Carter also suffered financial harm in the form of lost money/retirement savings because Old Dominion imprudently caused the Plan, and its participants, to pay indirect excessive float and revenue sharing compensation to Empower during the relevant time period.

35.     These actions by resulted in Old Dominion committing an additional Plan-wide breach causing financial harm to Plaintiffs Sealy and Carter's individual accounts, namely because they lost money/retirement savings and the opportunity to grow their retirement savings with money that instead was wasted on excessive compensation payments to Empower.

36.     Plaintiffs Sealy and Carter seek to recover this money that should have been in their accounts had it not been for Old Dominion's fiduciary imprudence.

37.     Named Plaintiff Harvey L. Davis is also a current participant in the Plan. Through his individual account in the Plan, Plaintiff Davis invested in the Plan's stable value funds. He remains invested in the Plan today.

38.     Plaintiff Davis's individual retirement account was injured by Old Dominion's alleged breach of fiduciary duty of prudence.

- 8 -

39. More specifically, Old Dominion imprudently caused the Plan's recordkeeper, Empower, to receive millions of dollars of excessive recordkeeping compensation from the Plan and its participants, including Plaintiff Davis, by causing the Plan to pay Empower excessive direct fee compensation, excessive float compensation, and excessive revenue sharing compensation.

40. By of specific example and not limitation, as set out below, like all Plan participants, Plaintiff Davis suffered financial harm in the form of lost money/retirement savings because Old Dominion caused him to pay $67 per year in 2022 just direct compensation to Empower when other prudent fiduciaries, including those for Plan of similar size and holdings also utilizing Empower as recordkeeper, secured the same services for less than half the price.

41. As set out below, Plaintiff Davis paid similarly excessive amounts in direct compensation for recordkeeping every year he invested in the Plan when, once again, other prudent fiduciaries, including those for Plan of similar size and holdings also utilizing Empower as recordkeeper, secured the same services for less than half the cost.

42. Plaintiff Davis suffered further financial harm in the form of lost money/retirement savings because Old Dominion imprudently caused the Plan, and its participants, to pay excessive float compensation and indirect compensation via revenue sharing to Empower.

43. These actions by resulted in Old Dominion committing an additional Plan-wide breach causing financial harm to Plaintiff Davis's individual account, namely because he lost money/retirement savings and the opportunity to grow his retirement savings with money that instead was wasted on excessive direct fee compensation, excessive float compensation, and excessive revenue sharing compensation.

44. Plaintiff Davis also seeks to recover this money that should have been in his account had it not been for Old Dominion's fiduciary imprudence.

45. Plaintiffs Sealy, Carter and Davis's individual accounts in the Plan suffered losses because each of their accounts was assessed an excessive amount for administrative fees, which would not have been incurred had Old Dominion discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

46. Based on the documents available to Plaintiffs thus far, by adding the indirect compensation to the direct compensation paid to Empower, including the true total compensation paid to Empower was easily over $150 per participant per year when it should have been $25 or less. Plaintiffs Sealy, Carter, and Davis's individual retirement accounts suffered economic losses as a result of Old Dominion's imprudent decision to pay excessive direct compensation, float compensation, and indirect compensation via revenue sharing to Empower.

47. Should Plaintiffs prevail, the value of Plaintiffs Sealy, Carter, and Davis's' individual retirement accounts would increase as a result of any Plan recovery because they paid excessive recordkeeping compensation that would be recovered and distributed to Plan participants' individual accounts.

48. In terms of ERISA standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Old Dominion's fiduciary breaches.

49. The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. Indeed, if Old Dominion acted prudently, it would immediately correct the flaws identified in this Complaint to stop losses from continuing to occur to the Plan and its participants.

50.     Section 1132(a)(2) authorizes any Plan participant to sue derivatively as a representative of the Plan to seek relief on behalf of the Plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Old Dominion's fiduciary breaches and the Plan remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

51.     As a result of Old Dominion's imprudence, Plaintiffs and Plan participants are entitled to restitution in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Old Dominion's breaches of fiduciary duty as described herein.

### *Old Dominion*

52.     Old Dominion is a statutory fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) represents to Plan participants that it is a fiduciary of the Plan.

53.     Old Dominion has the complete power, in its sole discretion, to determine all questions arising in connection with the administration, interpretation, and application of the Plan (and any related documents and underlying policies.

### CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):

> **All persons who were participants in or beneficiaries of the Plan, at any time between September 21, 2016, and the present (the "Class Period").**

55.     The members of the Class are so numerous that joinder is impractical. According to the Plan's Annual Form 5500 for the year ending 2022, filed with the U.S. Department of Labor, there were 26,874 Plan participants with account balances as of December 31, 2022.

56.     Plaintiffs' claims are typical of Class members' claims. Like other Class members, Plaintiffs participated in the Plan and suffered injuries because of Old Dominion's ERISA fiduciary breaches. Old Dominion treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and Class members' claims arise out of the same conduct, policies, and practices of Old Dominion as alleged herein, and all members of the Class have been similarly affected by Old Dominion's ERISA violations and will be similarly affected in the future unless remedial measures are adopted.

57.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      A.     Whether Old Dominion is a fiduciary of the Plan;

      B.     Whether Old Dominion breached its fiduciary duty of prudence by engaging in the conduct described herein;

      C.     Whether Old Dominion failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

      D.     Whether Old Dominion caused the Plan to pay excessive compensation to Empower;

      E.     Whether Old Dominion caused the Plan to pay excessive fees for investments;

      F.     The proper form of equitable and injunctive relief; and

      G.     The proper measure of relief.

- 12 -

58.     Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other Class members. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this action as a class action.

59.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Old Dominion. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

60.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because Old Dominion has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## EXCESSIVE COMPENSATION

61.     Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in a plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about a plan and to review their accounts. The recordkeeper may also provide access

- 13 -

to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

62.     Nearly all recordkeepers in the marketplace for billon dollar plans offer the same services. The services are fungible.

63.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. By way of analogy, recordkeeping services are similar with respect to services provided by mortgage companies. In both industries the services provided by competitors are very similar and entities compete on price. As a result of such competition, recordkeepers (like mortgage companies) vigorously compete for business by offering the best price.

64.     The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

65.     Recordkeeping expenses can be paid directly from plan assets, or indirectly by taking money from plan participants' individual accounts (or a combination of both).

66.     In a typical "direct" recordkeeping fee arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $30.00 per year, per plan participant.

67.     A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual services provided and does not grow based on matters that have

- 14 -

nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth, or greater plan contributions by employees.

68.     By way of illustration, a plan with 30,000 participants and $3 billion in assets may issue a request for proposal to several recordkeepers and request that the recordkeepers provide pricing based on a flat rate for a 30,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $30.00 per participant, per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $900,000 direct annual fee (30,000 participants at $30.00 per participant). If the plan's assets double and increase to $6 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not double like the plan assets did.

69.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30.00 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per participant rate of $30.00 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $3 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of his or her account balance annually for recordkeeping ($900,000/$3,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $900,000 price that was negotiated at the plan level for services to be provided to the plan.

- 15 -

70. Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar per head and asset-based approaches. Plaintiffs here are specifically not alleging that Old Dominion was required to use a direct payment arrangement – or any specific payment arrangement for that matter. Rather, Plaintiffs are simply providing details on how direct payment methods operate and provide these details to partially illustrate (together with all the allegations herein) that the compensation Plan participants are paying to Empower is grossly excessive and that Old Dominion should have done more to investigate, monitor, request, negotiate, and secure reasonable fees for the Plan.

71. The Plan's recordkeeper, Empower, receives compensation via both direct and indirect payment streams from the Plan.

72. As disclosed in the Plan's Annual 5500 Disclosures, Empower received direct compensation from the Plan as follows:

| Year | Direct Compensation | Plan Participants | Per Participant |
|------|---------------------|-------------------|-----------------|
| 2022 | $1,791,722 | 26,874 | $67 |
| 2021 | $1,708,031 | 24,033 | $71 |
| 2020 | $1,506,318 | 19,086 | $79 |
| 2019 | $1,228,006 | 18,553 | $66 |
| 2018 | $1,308,207 | 17,754 | $74 |
| 2017 | $1,278,670 | 14,719 | $87 |
| 2016 | $1,102,239 | 13,499 | $82 |

73. A reasonable total amount of compensation for Empower's specific services provided to the Plan ought to be no more than $25 annually. As the table above shows, Empower received excessive direct compensation every year during the Class Period. But it gets much worse.

74.     Empower also receives indirect compensation from the Plan for recordkeeping services. Empower receives indirect fees in two material ways. First, Empower receives compensation via "float" on Plan participant money.  Second, Empower receives compensation via a practice known as revenue sharing.

75.     With regard to fees via float, Old Dominion agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan that the money will first pass through an Empower clearing account. Plan participant money typically sits in Empower's clearing account for 2-3 days. Old Dominion also agreed Empower could keep the investment returns and/or any interest earned on Plan participant money while the money is in Empower's clearing account. This is a form of indirect compensation that Empower receives as the recordkeeper for the Plan. The Plan's Annual Form 5500 for the year ending 2022 shows that more than $500 million was transferred in and out of the Plan in the year 2022.  However, Empower has not tracked, monitored, or negotiated the amount of compensation Empower receives from income it earns on Plan participant money while the money is in Empower's clearing account.  If Empower earned just 1% on $500 million in 2022, then Empower pocketed $5 million in float income for 2022 alone. And Empower earned float income throughout the Class Period. To identify exactly what Empower earned in float income throughout the Class Period, Plaintiffs will need to obtain that information from Empower because Old Dominion imprudently failed to do so and has otherwise made no meaningful disclosures to Plan participants concerning the compensation Empower receives via float.

76.     Old Dominion breached its fiduciary duty of prudence by allowing Empower to receive compensation from Plan participants via float without even knowing the amount of compensation Empower collects from interest on participant money as to the float, and because

- 17 -

the amount of compensation Empower receives via float is excessive relative to the services provided and relative to prudent options in the marketplace.

77. The U.S. Department of Labor has provided clear and unequivocal instructions on the issue. (*See* Department of Labor, Field Assistance Bulletin No. 2002-03, dated November 5, 2002, available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03, last visited on September 13, 2023.) The Department of Labor instructs that float income is compensation that must be considered, negotiated, and monitored by ERISA fiduciaries, and further instructs that it is imprudent under ERISA for a plan sponsor (like Old Dominion here) to fail to do so.

78. Old Dominion's fiduciary failure to include compensation Empower received from the Plan via float caused the Plan to suffer millions in losses during the Class Period. Plaintiffs and all Plan participants suffered monetary losses. Had Old Dominion considered, monitored, tracked, and included the amount of compensation Empower receives from the Plan via float, that amount would have offset the other direct and indirect compensation Plaintiffs and Plan participants paid to Empower. Plaintiffs thus suffered concrete and particularized injuries caused by Old Dominion's ERISA fiduciary breach of prudence.

79. Empower also receives indirect compensation via revenue sharing. In a revenue sharing arrangement (like float), the amount of compensation for recordkeeping services to a plan is not based on the actual value of any services, instead compensation is based on the amount of assets in the plan, or amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in a plan. The fees will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of example, if a recordkeeper

- 18 -

contracts to receive one percent annually of assets in the plan as indirect compensation for a plan with 100 participants and $300,000 in plan assets, the recordkeeper would receive $3,000 per year in fees, or $30.00 on a per plan participant basis. But if the plan assets increased to $300,000,000 – and the contract remains the same, the recordkeeper receives $3,000,000 per year in fees, or $30,000 per plan participant. This would be an excessive fee by any measure.

80.     Revenue sharing (like float), while not a *per se* violation of ERISA, can lead to massively excessive fees if not properly understood, monitored, and capped. If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

81.     Self-interested recordkeepers prefer fee agreements that allow them to receive "direct" and "indirect" payments for recordkeeping. Recordkeepers often tout the direct fees they collect as being "reasonable" while they surreptitiously pilfer retirement savings from Plan participant via indirect fees. Such is the case here.

82.     Recordkeepers often attempt to construct their fee agreements so that their fees are not solely tied to any actual services, but to the amount of assets in a plan (*i.e.*, float and revenue sharing). That way, as Plan assets increase, so do the recordkeepers' fees. Plaintiffs are not making a claim against Old Dominion merely because it allowed the Plan's recordkeeper to pocket direct and indirect fees. However, as here when indirect fees are left unchecked, they can be devastating for Plan participants. As one commentator noted, "[A]t worst, revenue sharing (one source of indirect fees) is a way to hide fees. Nobody sees the money change hands, and very few

- 19 -

understand what the total investment expense pays for.  It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[1]

83.     Another commentator likened a revenue sharing fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

84.     By way of illustration, in 2022, the Plan had roughly $275 million invested in the JP Morgan Target Date funds on the Plan's investment menu. These funds pay approximately 18 basis points to Empower in revenue sharing. The amount is taken directly from Plaintiffs' and Plan participants' investments in the JP Morgan Target Date funds. That means, in 2022 alone, Empower received roughly another $500,000 in indirect compensation via revenue sharing (18 basis points x $275 million = $500,000). The JP Morgan Target Date funds were included on the Plan's investment menu every year during the Class period. Empower received revenue sharing compensation every year from investments in the JP Morgan Target Date Funds made by Plan participants during the Class period (and other funds paid revenue sharing to Empower too). The revenue sharing payments add to the already grossly excessive compensation that Empower receives for the specific services it provides to the Plan.

85.     The excessive revenue sharing payments caused Plaintiffs and Plan participants to suffer financial losses. Had Old Dominion prudently considered, monitored, tracked, disclosed,

---

[1]     Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited September 21, 2023).

and negotiated the compensation Empower received from revenue sharing, Old Dominion would have been able to reduce the excessive compensation Plaintiffs and Plan participants paid to Empower.

86.     It is well-established that plan fiduciaries have an obligation to monitor and control compensation paid to plan recordkeepers and to ensure that such compensation is reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive compensation to recordkeepers "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

87.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeper compensation being paid by the plan. A prudent fiduciary tracks the recordkeeper's compensation by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

88.     Second, make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable amount for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and indirect compensation to the plan's

- 21 -

recordkeeper. To the extent that a plan's investments pay asset-based float and revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

89.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

90.     Old Dominion failed to conduct meaningful requests for proposals ("RFP") at reasonable intervals too. This imprudent failure exacerbated the losses suffered by the Plan and caused the Plan to overpay for recordkeeping during the entire Class period.

91.     Empower has been the Plan's recordkeeper during the entirety of the Class Period. However, during the Class period, Empower's parent company Great-West Life & Annuity Company and Empower's sister company, Advised Assets Group, LLC, also wholly owned by Great-West Life & Annuity Company, were designated as the Plan's recordkeeper. For purposes of this Complaint, Plaintiffs refer collectively to these affiliated entities as Empower.

92. By going through a meaningful RFP process annually, or at least every three years—rather than not at all—a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

93. Besides failing to engage in the RFP process, the Plan's government mandated disclosures fail to accurately disclose how much compensation Empower receives from the Plan. Moreover, the disclosures contain false information about Empower's compensation. By way of specific examples, the Plan's 2022 Annual Form 5500 disclosure states Empower received no indirect compensation from the Plan – when Empower received millions of indirect compensation via float and revenue sharing. Below is a screenshot of the 2022 Annual Form 5500 disclosure.

EMPOWER ADVISORY GROUP, LLC

84-1532243

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 26 50 | NONE | 1791772 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Old Dominion made similar false statements about Empower's compensation in the Plan's 2021, 2020, 2019 Annual Form 5500 disclosures.

91. Inexplicably, however, the Plan's 2016-2018 Annual Form 5500 disclosures state that Empower received indirect compensation from the Plan. But rather than identify the amount of the indirect compensation, Old Dominion stated the amount of such compensation was "$0" but

claims that Empower provided it with a "formula instead of an amount or estimated amount." The problem with this, of course, is that Old Dominion fails to disclose to Plaintiffs or Plan participants what that the alleged formula is, much less how application of that formula translates to the amount of "indirect compensation" plan participants are paying to Empower. For example, below is a screenshot of the Plan's 2018 Annual Form 5500 disclosure.

| GREAT-WEST LIFE & ANNUITY INS. CO | | | 8515 EAST ORCHARD ROAD GREENWOOD VILLAGE, CO 80111 | | | |
| --- | --- | --- | --- | --- | --- | --- |
| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
| 64 | NONE | 130820 | Yes ☒ No ☐ | Yes ☒ No ☐ | 0 | Yes ☒ No ☐ |

92.    Old Dominion's documented failures on government mandated disclosure forms to accurately disclose the amount of Empower's compensation shows that Old Dominion does not even know how much the Plan is paying Empower.

93.    During the Class period Empower received indirect compensation via revenue sharing and float but the compensation was not disclosed. The compensation that Empower received from the Plan was indisputably far more than Old Dominion disclosed causing the Plan participants to pay.

94.    Further, during the Class period the assets in the Plan increased by more than $1 billion. In 2016, the Plan had assets totaling $674,320,493. In 2022, the Plan had assets totaling $1,798,412,328. Because Empower receives indirect compensation via float and revenue sharing, its compensation has exploded solely because Plan assets have increased by more than a billion dollars during the Class period. Old Dominion has failed to monitor and control Empower's

- 24 -

compensation as Plan assets increased. This is yet another classic example of a breach of ERISA's fiduciary duty of prudence.

95. The compensation paid to Empower is far greater than recognized reasonable rates for a plan with nearly $2 billion in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable and even superior to the services provided to the Plan by Empower.

96. To be sure, the compensation Empower received from the Plan was grossly excessive relative to the specific services Empower provided to the Plan. The specific services Empower provided to the Plan here include, providing enrollment and educational materials; validating payroll data; tracking employee eligibility and contributions; transaction processing; preparing Annual form 5500 disclosures; verifying participant status; maintaining a website; printing and mailing account statements; and maintaining a customer service telephone line. The primary service provided by Empower, however, is keeping track of how much money plan participated have invested in the Plan and what Plan participants have earned or lost on such investments.

97. The compensation Empower received for the specific services provided to the Plan were and remain excessive in relation to the services that the plan provided because, in fact, the services that Empower provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action.

98. Looking at recordkeeping costs for other plans of a similar size shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

- 25 -

99.     The chart below compares the compensation Old Dominion caused its Plan to pay Empower with similarly sized plans. Some of these plans used Empower as their recordkeeper, while others used different well-respected and well-known national recordkeepers for billion-dollar plans.

| Plan Name | Record-keeper | Total # participants w/ account balances | Dollar value of plan assets | Total reported recordkeeping and administrative service costs paid to in 2021 | Direct Record-keeping and administrative service costs per-participant basis[1] |
|---|---|---|---|---|---|
| Old Dominion 401(k) Retirement Plan | Empower | 26,874 | $1,794,370,156 | $1,791,772 | $66.67 |
| McLaren Employees' 403(b) Retirement Plan | Empower | 23,654 | $1,449,747,534 | $250,125 | $10.57 |
| International Paper Company Hourly Savings Plan | Empower | 27,128 | $1,829,381,666 | $762,765 | $28.11 |
| DXC Technology Matched Asset Plan | Fidelity | 27,303 | $2,342,289,628 | $225,563 | $8.26 |
| Savings and Supplemental Retirement Plan of Novant Health, Inc. | Fidelity | 35,848 | $1,275,434,210 | $247,747 | $6.91 |

100.    The comparable Plans above received at least the same services as the Old Dominion Plan. The Old Dominion Plan, however, paid Empower much more compensation for the same services than the plans identified above. That is, caused its Plan to pay Empower excessive fees for the same services Empower offered for much less to the comparator plans. Plaintiffs' anticipated expert witness reports will expand on the benchmarking herein and demonstrate conclusively that the Plan paid excessive and unreasonable compensation to Empower.

- 26 -

101.    As demonstrated by these benchmarks, considering that the recordkeeping services provided by Empower for the Plan are similar to those provided by Empower to prudently administered plans and by all national recordkeepers of $1 billion plans, Old Dominion's decision to cause the Plan and its participants to pay at least $66 and as much as $82 per year in direct compensation to Empower during the Class Period is both imprudent and in violation of ERISA.

102.    And this, of course, is only the direct compensation that Old Dominion admits to causing the Plan to pay Empower. In reality, based on the documents available to Plaintiffs thus far, by adding the indirect compensation to the direct compensation paid to Empower, including the true total compensation paid to Empower was easily over $150 per participant per year. The Plan, due to its number of participants and assets, had the leverage to negotiate much cheaper recordkeeping costs but failed to do so, costing the Plaintiffs and Plan participants millions in lost retirement savings.

103.    By way of another meaningful benchmark,  Fidelity Investments ("Fidelity") is the nation's largest provider of recordkeeper services. Empower is the nation's second largest provider of recordkeeper services. As of September 2022, industry expert, Pensions & Investments, reported that Fidelity had $3.2 trillion of recordkeeping assets in 401k plans. Empower held roughly $1.2 trillion. Empower and Fidelity are competitors in the recordkeeping space.

104.    Fidelity's own retirement plan was recently sued and Fidelity's employees alleged that Fidelity was receiving excessive compensation from its own plan participants. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than

those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."

*Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

105.    Additionally, in the *Moitoso* case Fidelity went on to stipulate as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).[2]

106.    The key takeaway from this stipulation by Fidelity, which was submitted under penalty of perjury, is simple: Fidelity who is Empower's number one marketplace competitor, admitted: (a) its own plan did not offer services broader or more valuable than any of the plans it served and, more importantly, (b) the value of those services ranged from between $14 to $17 per participant annually; and (c) that a prudent fiduciary for a plan with at least $1 billion in assets could have secured Fidelity's recordkeeping services for between $14 to $17 per participant, per year. Thus, for Old Dominion to permit Empower to receive in excess of $150.00 per participant annually is both imprudent and a rank breach of its fiduciary duty.

107.    By way of another data point, in 2020, after being sued for allowing its recordkeeper to collect excessive compensation from its plan participants, the University of Chicago ERISA fiduciaries reduced annual recordkeeping fees for its plans to between $21-$44

---

[2] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2.

per participant. The University of Chicago plan was similar to the Plan here with 10,118 active participants and about $3 billion in assets under management.

108.    Old Dominion could have and should have used the Plan's increasing size and long-standing relationship with Empower as bargaining power to reduce the Plan's recordkeeping costs. However, the opposite has occurred. Empower's compensation has increased by millions each year as Plan assets increase without Empower providing any additional specific services.

109.    At a minimum, Old Dominion should have but failed to hire an independent consultant to meaningfully benchmark the Plan's administrative costs or engaged in an objective, competitive process to hire a recordkeeper who would provide the same or similar services without pocketing excessive compensation from the Plan. Old Dominion's failure to perform these basic, but prudent, fiduciary actions constitute a clear violation of ERISA.

110.    In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Old Dominion could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by Empower at a lower cost – even by Empower itself – had Old Dominion acted as a prudent fiduciary would have under the circumstances. But Old Dominion failed to do so and, as a result, violated its fiduciary duties under ERISA.

## EXCESSIVE INVESTMENT RELATED FEES

111.    Old Dominion failed to prudently monitor and select proper share classes of nine (9) investments offered by the Plan. Investment companies offer pricing discounts to retirement plans. The discounts are offered mainly because investment companies recognize that trillions of dollars are invested through retirement plans and they want their investments to be offered by

- 29 -

retirement plans, so they offer pricing discounts to retirement plans. The discounts are typically referenced by what is known as "share classes." The "retail" share class of an investment charges a higher price than a "retirement plan" share class. But in all other material aspects, the underlying investment is the same. Here, Old Dominion selected more expensive share classes than identical less expensive share classes of the same investments. Except for the extra fees, the share classes are/were identical. Plaintiffs estimates that Old Dominion's imprudent choices as to share classes resulted in more than $1,000,000 in excessive fees paid by the Plan and its participants during the Class Period.

112.    A prudent fiduciary must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. If a fiduciary fails to select prudent investments or fails to remove an imprudent investment from a plan within a reasonable time, as Old Dominion has done here, a breach of ERISA's fiduciary duties occurs. *Hughes v. Nw. Univ.*, 211 L. Ed. 2d 558, 142 S. Ct. 737, 742 (2022).

113.    The U.S. Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

114.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's

continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

115. Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

116. Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

117. As demonstrated by the chart below, in several instances during the Class Period, Old Dominion failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

118. Unlike a claim premised on an imprudent choice between two different mutual funds that perform differently over time, a claim premised on the selection of a more expensive

- 31 -

class of the same fund **guarantees** worse returns. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022)

119.    The two share classes will produce the same initial returns, but higher costs will erode the retail shares' gains and steepen any losses. As costs compound, the differential will grow each year. Over the long haul, management fees, like taxes and inflation, are salient features of investment performance.

120.    During the Class Period, the Plan's menu needlessly consisted of expensive target date and mutual fund share classes offered by the Plan during the Class Period when, in fact, lower-cost share classes for the same funds were readily available:

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Expense Ratio |
|---|---|---|---|
| JPMorgan Smart Retirement – 2030 Fund R5 (JSMIX) | **0.52%** | JPMorgan Smart Retirement – 2030 Fund R6 (JSMYX) | **0.42%** |
| JPMorgan Smart Retirement – 2035 Fund R5 (SRJIX) | **0.54%** | JPMorgan Smart Retirement – 2035 Fund R6 (SRJYX) | **0.44%** |
| JPMorgan Smart Retirement – 2040 Fund R5 (SMTIX) | **0.55%** | JPMorgan Smart Retirement – 2040 Fund R6 (SMTYX) | **0.45%** |
| JPMorgan Smart Retirement – 2045 Fund R5 (JSAIX) | **0.55%** | JPMorgan Smart Retirement – 2045 Fund R6 (JSAYX) | **0.45%** |
| JPMorgan Smart Retirement – 2050 Fund R5 (JTSIX) | **0.55%** | JPMorgan Smart Retirement – 2050 Fund R6 (JTSYX) | **0.45%** |
| JPMorgan Smart Retirement – 2055 Fund R5 (JFFIX) | **0.55%** | JPMorgan Smart Retirement – 2055 Fund R6 (JFFYX) | **0.45%** |
| JPMorgan Smart Retirement – 2060 | **0.54%** | JPMorgan Smart Retirement – 2060 Fund R6 | **0.44%** |

| | | | |
|---|---|---|---|
| Fund R5 (JAKIX) | | (JAKYX) | |
| Russell US Small Cap Equity (RLESX) | **0.96%** | Russell US Small Cap Equity R6 (RSCRX) | **0.83%** |
| American Funds Europacific Growth R5 (RERFX) | **0.51%** | American Funds Europacific Growth R6 (RERGX) | **0.46%** |

121.    Each of the imprudent investments in the table above were included by Old Dominion on the Plan's investment menu during the entire Class Period. The referenced lower share classes of the same investments were available during the entire Class Period.

122.    Plaintiffs allege that these fees are excessive, ***not*** by virtue of their percentage, but because there are different versions of the same investment available to the Plan with identical managers, investments styles, and funds, that have lesser fees.

123.    Old Dominion should have known of the existence and availability of lower-cost share classes and should have promptly transferred the Plan's investments into such funds to the lower cost share classes.  However, Old Dominion failed to do so in a prudent manner.

124.    The Plan's collective investment in the imprudent funds during the Class Period is roughly as follows: 2022 – $392 million; 2021 – $481 million; 2020 – $447 million; 2019 – $396 million; 2018 – $284 million; 2017 – $284 million; 2016 – $220 million. In total, the Plan invested about $2.5 billion in the imprudent share classes during the Class Period. The imprudent share classes collectively charged 88 basis points more in fees than the identical available investments. Thus, during the Class Period, Old Dominion's imprudence caused roughly $22 million in losses to the Plan. And these losses will continue going forward unless Old Dominion takes prudent corrective actions because it is still causing the Plan to waste retirement assets and to inexplicably pay more for identical investments available to the Plan.

- 33 -

125. Again, the imprudent funds offered by the Plan were more expensive than the same funds available to the Plan — a claim nearly identical to one addressed by the Supreme Court recently in *Hughes v. Northwestern University,* 142 S. Ct. 737, 740 (2022) — and found sufficient to plausibly state a claim for breach of ERISA's duty of prudence.

126. Old Dominion used a flawed and imprudent fiduciary process by selecting and keeping during the entire Class Period, the imprudent funds identified herein. The imprudent process and decisions resulted in a significant waste of retirement savings for the Plan and its participants, including the Plaintiffs and other Plan participants.

127. Plan assets are being needlessly wasted and retirement savings frittered away. This is another classic breach of ERISA's fiduciary duty of prudence.

128. A prudent fiduciary conducting an impartial review of the Plan's investments on a monthly, quarterly, or at least an annual basis, would have easily identified the prudent share classes available and transferred the Plan's investments in the above-referenced funds into lower-cost prudent shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Old Dominion failed to do so, in breach of its fiduciary duties.

129. There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services nor benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

130. Plaintiffs are not arguing that Old Dominion had a duty to scour the market to find and offer a cheaper investment. Instead, Plaintiffs simply allege that lower cost investments with the identical managers, investments styles, and holdings should have been considered by the Plan.

- 34 -

# FIRST CLAIM FOR RELIEF
## _Breach of Fiduciary Duty of Prudence_

131.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

132.     As a fiduciary of the Plan, Old Dominion was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

133.     Old Dominion breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Old Dominion failed to monitor or control the excessive compensation paid for recordkeeping services. Additionally, Old Dominion did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and as to what was in the best interest of Plan participants as prudent fiduciary acting with the skill, diligence and in a like capacity (administering billion or retirement assets).

134.     Instead, Old Dominion selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

135.     Old Dominion also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and failed to act within a reasonable time to remove funds that should have been replaced with lower-cost share class funds.

136.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Old Dominion complied with their fiduciary obligations, the Plan would not have

- 35 -

suffered these losses, and Plan participants would have had more money available to them for their retirement.

137.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Old Dominion is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Old Dominion's breaches as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all Plan participants, respectfully request that the Court:

1.     Find and declare that the Old Dominion breached its fiduciary duties as described above;

2.      Find and adjudge that Old Dominion is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.     Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.     Order Old Dominion to provide all accountings necessary to determine the amounts Old Dominion must make good to the Plan under §1109(a);

5.     Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.     Surcharge against Old Dominion and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- 36 -

7.     Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.     Certify the Class, appoint the Plaintiffs as class representatives, and appoint his counsel as Class Counsel;

9.     Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 27th day of September, 2023.

Respectfully submitted,


/s/ *Matthew Norris J.*
**MATTHEW NORRIS J.**
NC Bar No. 37206
**NORRIS LAW FIRM, PLLC**
1776 Heritage Center Drive, Suite 204
Wake Forest, NC 27687
Telephone: (919) 981-4475
Facsimile: (919) 926-1676
Email: matt@lemonlawnc.com

**BRANDON J. HILL** (*special appearance request forthcoming*)
Florida Bar Number: 37061
**LUIS A. CABASSA** (*special appearance request forthcoming*)
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK** (*special appearance request forthcoming*)
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Facsimile: (813) 229-8712

- 37 -

Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MICHAEL C. MCKAY** (*special appearance request forthcoming*)
**MCKAY LAW, LLC**
Arizona Bar No. 023354
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us